## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**GERALD NEIL LINDLEY,**                    }
                                            }
    **Plaintiff,**             }
                                            }
    **vs.**                    }
                                            }
**NURSE FREDIA L. TAYLOR, in her**          }
**professional and official capacity as an**    }
**employee of the City of Birmingham, and**     }    **CASE NO. 2:10-cv-0141-SLB**
**as a Nurse at the Birmingham City Jail;**     }
**CORRECTIONAL OFFICER TANGERY**            }
**THOMAS, in her individual and official**      }
**capacity; CORRECTIONAL OFFICER**          }
**BERNADINE HARPER, in her individual**     }
**and official capacity; JOSSLYN A.**       }
**TARVER, in her individual and official**      }
**capacity; SERGEANT VERLYNE**              }
**MOTEN, in her individual and official**       }
**capacity,**                               }
                                            }
    **Defendants.**             }

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendants' Motion for Summary Judgment, (Doc.

120)[1], and defendants' Motion to Strike Plaintiff's Evidentiary Submissions, (Doc. 129).

Plaintiff Gerald Neal[2] Lindley has alleged various federal and state law claims against

defendants related to his nine-day confinement in the Birmingham City Jail, during which

---

[1] Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in this court's record on appeal.

[2] Apparently, plaintiff's middle name was misspelled on the original complaint and thus misspelled in the caption of the case. Plaintiff signed his affidavit "Neal." (Doc. 125-2 at 6.)

he allegedly developed an infection in his leg that required surgery upon his transfer to another facility. Upon consideration of the Motion, the supporting and opposing memoranda, arguments of counsel and the relevant law, the court finds, for the reasons stated below, that Defendants' Motion for Summary Judgment is due to be denied in part and granted in part, and defendants' Motion to Strike is due to be denied. Since the disposition of the Motion to Strike affects which factual claims will have sufficient evidentiary basis to be included in the statement of facts for summary judgment analysis, the court addresses the Motion to Strike first.

**I. Motion to Strike**

The Motion to Strike attacks the admissibility of portions of plaintiff's personal affidavit, (Doc. 125-2), the entirety of the records from Shelby County Jail, (Doc. 125-7), the entirety of the medical and billing records, (Doc. 125-8), the Photos (Docs. 28-15, 28-16, 28-17, 28-18, 28-19),[3] and the Notice of Claim, (Doc. 125-12).

Defendants assert that "Evidence submitted in opposition to a Motion to Summary Judgment must be admissible." (Doc. 129 at 2.) In fact, when objecting that "a fact is not supported by admissible evidence," the objecting party must show that the "fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

---

[3] These documents were listed as exhibit I in Plaintiff's Evidentiary Submission in Support of Response in Opposition to Motion for Summary Judgment, (Doc. 125 at 1), but somehow were not attached or did not make it into the court's electronic docket in that document.

2

Therefore, all of defendants' objections that certain documents are inadmissible because they have not had a proper foundation laid for their admission, or have not been authenticated, without merit. And defendants' other claim, that the submissions are "double hearsay and/or triple hearsay," is too generalized to do much good. The documents are not inadmissible hearsay in their entirety because they can be presented as records of a regularly conducted activity. F.R.E. 803(6). Defendants are correct that plaintiff is not a medical expert and his testimony that he had staph cannot stand alone as evidence that he in fact had a staph infection. (See Doc. 129 at 2-3.) However, the fact that he had a staph infection is supported by other admissible evidence, (see Doc. 125-8 at 4, 7),[4] and what plaintiff's complaint is really all about, the "extensive infection" in his knee, (*id*. at 11), or "very serious fasciitis of his leg," (*id*. at 13), that required immediate hospitalization,  is not debatable.

As to defendants' remaining concern, about the relevance of certain evidence, (specifically, plaintiff's evidentiary submission, Exhibit J, Notice of Claim), it is sufficient to say that if the court finds that the evidence is not relevant, the court will not consider the evidence in determining whether summary judgment is due to be granted.

Defendants' Motion to Strike will be denied.

---

[4] See also Doc. 125-7 at 3.

**II. Motion for Summary Judgment**

## <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial.").

4

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  As the Supreme Court has recently reaffirmed, "[t]he evidence of the nonmovant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (emphasis added). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## **STATEMENT OF FACTS**[5]

Detainees ordinarily have no reason to be especially grateful when released from one jail directly into the care of the next, but in this case, it might have saved plaintiff's life or limb. The Shelby County Sheriff's Department picked plaintiff up from the Birmingham City Jail the morning of February 2, 2008, took him to the Shelby County Jail, processed him, looked at the infected sore on his leg, gave him a shower and dressed him, and took him immediately to a nearby hospital.  He underwent surgery three days later. (Doc. 125-8 at 3, 11.)

---

[5] As required when determining a motion for summary judgment, the court has construed the facts in the light most favorable to plaintiff, the non-moving party.  All disputed facts are resolved in his favor and all reasonable inferences arising from those facts are drawn in his favor.  *See Crawford v. Carroll*, 529 F.3d 961, 964 n.1 (11th Cir. 2008) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

Plaintiff was arrested and booked into the City of Birmingham Jail on the night of January 23-24, 2008.[6] (Affidavit of Gerald Neal Lindley, Doc. 125-2 at 2-3.) Plaintiff first noticed the sore on his right knee on or about January 27, 2008 (a Sunday), and within twelve hours it was "highly inflamed, swollen," and, it seemed to him, "obviously infected." (Doc. 125-9 at 1.) "Starting January 28, 2008, [plaintiff] began to request that someone look at [his] right knee and the sore . . . and continued to fill out the forms [requesting to see the doctor] at each nurse call [(four times per day)] until the day [he] was released to Shelby County." (Doc. 125-2 at 3.) The infection became "steadily worse." (*Id*. at 4.) At least five different nurses visited him, and each time he showed them the sore, but he received no treatment. (Doc. 125-9 at 2.) Plaintiff "showed [his] knee to both nurse Taylor and nurse Brown," and when he "showed the nurses [his] leg, [his] entire knee area was clearly swollen, red, and very warm to the touch." (Doc. 125-2 at 3-4.)[7]

---

[6] When plaintiff arrived at the jail, he was booked for "Assault 2nd." (Doc. 125-13 (Davis Depo. at 40).) According to Kathy Davis, the Chief Jail Administrator, plaintiff may have been arrested because of his outstanding Shelby County warrant for assault, and, once he was in Birmingham custody, the Birmingham traffic charges showed up as well. (*Id*. at 41-42.) But Davis also testified that plaintiff was arrested because of the outstanding warrant on the traffic tickets, (*id*. at 28-29), and that the Birmingham Jail would not have held plaintiff for longer than a few hours waiting on Shelby County to pick him up, (*Id*. at 26-27). Davis testified that plaintiff would not have been put in the J-2 area if traffic tickets were the only concern because that area is for "high risk" detainees. (*Id*. at 100.)

[7] Plaintiff "specifically remember[s] talking to and showing the condition of [his] knee to nurse Fredia Taylor, nurse Allinda Brown, Correctional Officer John Glenn, [and] Correctional Officer Montgomery." (*Id*. at 4.)   Additionally, the court notes that Nurse Taylor is referred to as Frida Taylor and Fredia Taylor.  Apparently the correct spelling of her name is "Fredia Taylor."  (*See* Doc. 28-5.)

Defendant Fredia Taylor is a licensed practical nurse (LPN), (Doc. 125-18 (Taylor Depo. at 8)), who worked the 3:00 p.m. to 11:00 p.m. shift at the Birmingham City Jail, (*id*. at 9). Two nurses worked the day shift (7:00 a.m. to 3:00 p.m.), two nurses worked the evening shift (3:00 p.m. to 11:00 p.m.), and one nurse worked the 11:00 p.m. to 7:00 a.m. shift. (*Id*.) Taylor testified that she worked on the J-1 floor of the jail and "wouldn't go up [to J-2-D]."[8] (*Id*. at 14-15.) According to Kathy Davis, the Chief Jail Administrator, area J-1-A is a "medical block." (Doc. 125-13 (Davis Depo. at 104).)

Taylor testified that whenever someone turns in a "doctor form," that person is "going to see a doctor," although if the person turns in multiple forms, those forms might be noted in the person's chart for the doctor to see once the person is examined. (Taylor Depo. at 22.)[9] Dr. Robinson, the jail's physician at the time, visited on Mondays, Wednesdays, and Fridays. (*Id*. at 31; see also 27:13-21, 39:2-7, 39:19-22; see also Davis Depo. at 16.) A psychiatrist also visited occasionally, and there were two "staff nurses," including Taylor, and a "number of agency nurses" that came in to fill out the staff. (*Id.* at 32-34.) That was the medical

---

[8] During the deposition, plaintiff's counsel was apparently under the impression that Lindley stayed in J-2-D block at the jail. In fact, Lindley stayed in J-2-A. (*See* Davis Depo. at 101-102; Doc. 125-3 at 3.)

[9] A fair reading of this testimony is that a nurse does not have discretion to decide not to inform the doctor about a request to see a doctor, but that each time a nurse sees a detainee, the nurse necessarily exercises discretion as to whether the detainee's complaints warrant immediate medical attention.

Davis, however, testified that the nurse has some discretion as to whether the detainee should see the doctor. (Davis Depo. at 22-23.)

department at the jail. (*Id.* at 33:19-34:4; see also Davis Depo. at 15.) Taylor and Brown were City of Birmingham employees. (Davis Depo. at 70.)

"After being refused medical care for several days, [plaintiff] complained to a correctional officer" and was told to fill out a "grievance form." (Doc. 125-2 at 4.) However, the officer would not provide him the form, and whenever officers would ask what was wrong and he would tell them, "[t]hey would refuse to give [him] a [grievance] form and tell [him] to fill out a medical request form." (*Id.*) According to Davis, the Chief Jail Administrator,[10] when a detainee complains of a medical problem to a correctional officer, the correctional officer is supposed to call the nurse, and "the nurse's responsibility is to call the detainee down to the nurse's station to find out" what is wrong. (Davis Depo. at 19-20.) Defendant Verlyne Moten was "the person responsible for making sure that the grievances were answered in a timely manner," (Doc. 125-11 (Moten Depo. at 86)), and it was her job to "make sure the detainees get the care they need," (*id.* at 81), but she didn't recall plaintiff having any medical problems while at the jail, (*id.* at 84-85).

A "staff [sic] infection" is mentioned three times in what plaintiff has identified as the "Cell Block Post Ledger," which is a "ledger book kept . . . in the cell block by the correctional officers." (*See* Ex. E, Doc. 125-5; Davis Depo. at 87:18-88:1.) On January 31,

---

[10] Davis described her position as "the top person on site." (Davis Depo. at 10-11.) Davis oversaw three lieutenants and thirteen sergeants. (*Id.* at 12.) Being a sergeant is a promotion from being a correctional officer, (Doc. 125-11 (Moten Depo. at 7-8)), and Davis never testified as to how many correctional officers she oversaw.

2008, during the 7 a.m. to 3 p.m. shift, Defendant Tangery Thomas wrote, "It was stated J2A-cell 6 has a staff [sic] infection couldn't be verified by nurse." (Doc. 125-5 at 3; *see* also Doc. 121-3 at 6-7, Thomas's Responses to Plaintiff's Interrogatories.) Thomas explained that she heard a "rumor" that "the occupant of Cell J-2-A cell 6 had a staph infection . . . [and] noted it on the log and checked with the nurse to see if she had any medical requests or documents reporting or requesting treatment for a staph infection," but "no medical documentation was received by the nurse to verify anyone having a staph infection." (Doc. 121-3 at 6-7, Thomas's Responses to Plaintiff's Interrogatories.) While at the jail, plaintiff was kept in J-2-A, cell 6. (*See* Davis Depo. at 101-102; Doc. 125-3 at 3.) Upon reading this entry on the same shift, Moten spoke with Thomas about it, then "checked with the nurse to confirm if any inmates were being treated for a staph infection.[11] No medical documents were found stating any inmates in the jail were being treated for a staph infection." (Doc. 121-1 at 6-7, Moten's Responses to Plaintiff's Interrogatories.) Moten then wrote, "There is no medical documentation on detainee's having staff [sic] infection." (Doc. 125-5 at 1; Doc. 121-3 at 7.) The entry for the 3:00 p.m. to 11:00 p.m. shift on February 1 states, "Detainee Gerald Lindley w/m [(white male)] has staff [sic] infection to the leg." (Doc. 125-5 at 2.) The entry immediately below that, written by defendant Josslyn Tarver upon starting the February 1,

---

[11] The daily personnel report for January 31, 2008 lists defendants Thomas and Bernadine Harper as being on duty in area J-2. (Doc. 125-4.) Moten is also listed, although her area is not, and in its place is her rank, "CSU," (*id.*), which probably means "Correctional Supervisor," (*see* City of Birmingham Jail Rules and Regulations, Doc. 125-16 at 4, 6 ¶ II.C.).

2008, 11:00 p.m. to 7:00 a.m. shift, states, "Nothing to pass on." (*Id*. at 2; *see* Doc. 125-15 at 6-7.)

By the time Shelby County Officers picked him up at the Birmingham Jail on February 2, 2008, he had to be helped out of his clothes and could not walk on his own.[12] (Doc. 125-2 at 4-5.) While he was being processed into the Shelby County Jail, a nurse examined his knee. (*Id*. at 5.) The nurse noted that Lindley was "unable to walk," that his knee had an abscess with a "blackened center," and that it was "hot to the touch." (Doc. 125-7 at 1.) Lindley was showered, dressed, and then taken to the hospital. (Doc. 125-2 at 5.) Soon after arriving, he was taken to the emergency room, started on an intravenous drip, and seen by a "number of doctors." (*Id*.) The doctors made an incision at his knee, which "drained a large amount of foul[-]smelling dark fluid." (*Id*.)

The Operative Report listing date of surgery as February 5, 2008 states: "The patient had extensive infection of the right lower extremity, which was not responding to antibiotics. . . . [T]he patient had been able to milk large amount of pus out of his thigh through an opening to the right of the patella." (Doc. 125-8 at 11.) He was placed under general anesthesia for surgery, his wound was "debrided," and "strips of fascia" were removed, along with "some necrotic fascia." (*Id*.) The Operative Report listing date of surgery as February

---

[12] Moten remembered seeing Lindley "standing at the counter" just before he was to be picked up by Shelby County police, and she remembered talking to "a nurse or Sergeant King at Shelby County," who was "pretty much upset and irate" and wanted to know "why did we send a detainee to them that needed medical treatment. (Moten Depo. at 63-64.)

6, 2008 states: "The previous evening, the patient had had aggressive and extensive debridement of very serious fasciitis of his leg," but by this point there was "[m]uch less necrosis of the fascia."[13] He was again placed under general anesthesia, and the wound was debrided. (Doc. 125-8 at 13.) He remained in the hospital until February 14, 2008. (Doc. 125-2 at 5.) In a followup statement on February 21, 2008, the doctor said, "He has been on a wound vac. This has been removed . . . . We are going to continue the wound vac for about another week . . . . The width of the wound . . . may mean that we are obliged to close this with a split thickness skin graft." (Doc. 125-8 at 7.) In a followup statement on March 31, 2008, the doctor stated, "Cultures obtained during [the February 6th] procedure grew Staph aureus."[14] (Doc. 125-8 at 4.) The Shelby County Nurse Notes entry for February 7, 2008, notes "MRSA[15] grew out of culture." (Doc. 125-7 at 3.) A physical exam statement dated

---

[13] Débridement is "[t]he removal from a wound, etc., of damaged tissue or foreign matter."  OED Online, http://www.oed.com/view/Entry/47930 (last visited January 13, 2015). Fasciitis is "inflammation of [a 'thin sheath of fibrous tissue investing a muscle']." OED Online, http://www.oed.com/view/Entry/68359 (quoting http://www.oed.com/view/Entry/68341) (last visited January 13, 2015). Necrosis is "[d]eath of tissue or cells; an instance or area of this." OED Online, http://www.oed.com/view/Entry/125717 (last visited January 13, 2015).

[14] "Staphylococcus aureus causes most staph infections." MedlinePlus, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/staphylococcalinfections.html (last visited January 13, 2015.) Staphylococcus is "[a] form of pus-producing bacteria." OED Online, http://www.oed.com/view/Entry/189060 (last visited January 13, 2015).

[15] MSRA stands for methicillin-resistant Staphylococcus aureus. OED Online, http://www.oed.com/view/Entry/111722 (last visited January 13, 2015).

April 2, 2008 states: "He has a very long stripe down the entire length of his thigh and most of his leg . . . . I still think he needs a skin graft . . . ." (Doc. 125-8 at 5.)

For ten months, until the wound healed, he received follow up treatment from doctors and nurses. (Doc. 125-2 at 5.) A "deep and wide" scar remains on his leg, "running from the top of [his] thigh to below [his] knee." (*Id*. at 6.)

Lindley filed suit on January 22, 2010, just before the two-year statute of limitations ran, naming various defendants including "Kathy Davis – in her individual and official capacity as Chief of Birmingham City Jail, . . . Nurse Frida (last name unknown) – in her individual and official capacity as a Nurse at the Birmingham City Jail; Correctional Officer Glenn (first name unknown)," and two other last-name-only officers. Davis joined in a motion to dismiss on February 18, 2010, and filed her answer on March 12, 2010. An extended period of discovery commenced, during which Glenn, Moten, and Taylor were deposed on October 14, 2010, and Davis was deposed on November 9, 2010. The court granted Lindley leave to file a motion to amend his complaint. Lindley filed the Amended Complaint on December 31, 2010, putting forward four counts: (1) a claim under 42 U.S.C. § 1983 against all defendants for violations of rights secured to him by the Fifth, Eight, Ninth and Fourteenth Amendments to the Constitution; (2) a claim against all defendants for violation of the Equal Protection Clause of the Fourteenth Amendment; (3) a claim for negligence against all defendants; and (4) a claim for spoliation of evidence against all defendants. (Doc. 50 at 8-12.) He seeks declaratory and monetary relief. (*Id.*) The Amended

Complaint named new defendants, including the defendants remaining in this case. (*Id.*) Lindley is suing all remaining defendants in their individual and official capacities. (*Id*. at ¶¶ 10, 14, 15, 21, 23.) After dispositive motions, appeals, and remands, the case is before the court on the remaining defendants' Motion for Summary Judgment. (Doc. 121.)**16**

## ANALYSIS

### I. Statute of Limitations

Even civil claims arising from the most serious injuries caused by the most culpable defendants live and die by a statute of limitations. As the Eleventh Circuit recognized in its examination of this case, plaintiff's claims are subject to Alabama's two-year statute of limitations. (See Doc. 103-1 at 3 (citing *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008); Ala. Code § 6-2-38 (1975)).) Therefore, once his claims arose on or about February 2, 2008, plaintiff had two years to file a claim against the defendants. His original complaint was timely but did not name the present defendants.[17] The question is whether his otherwise untimely amended complaint, which did name the present defendants, can be saved by the relation back doctrine.

The Eleventh Circuit has explained in this case,

Federal Rule of Civil Procedure 15(c) governs when an amended complaint may "relate back" to an earlier complaint, and therefore be considered filed at the time of the initial complaint. An amended complaint that adds a party or

---

[16]After the second remand from the 11th Circuit, this case was reassigned to the undersigned on May 13, 2013.  (Doc. 104.)

[17]The original complaint did name "Nurse Frida (last name unknown)" as a defendant.

13

changes the name of a party relates back where (1) the claim "arose out of the same conduct, transaction or occurrence set out—or attempted to be set out—in the original pleading;" (2) the new party "received such notice of the action that it will not be prejudiced in defending on the merits;" (3) the party being added received such notice within the time period of Rule 4(m), 120 days; and (4) the party being added "knew or should have known [within the Rule 4(m) time period] that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(B), (C)(i-ii); *see* Fed. R. Civ. P. 4(m).

> The Supreme Court addressed the interplay between Rule 4(m) and Rule 15(c) in determining when a plaintiff may file an amended complaint in *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 130 S. Ct. 2485 (2010). In that case, the defendant asserted that "Rule 15(c) requires a plaintiff to move to amend her complaint or to file and serve an amended complaint within the Rule 4(m) period." *Id.* at 2497 n. 5. The Supreme Court rejected that assertion finding that "the speed with which a plaintiff moves to amend her complaint or files an amended complaint after obtaining leave to do so has no bearing on whether the amended complaint relates back." *Id.* at 2496. Rather, the pertinent question is whether within the Rule 4(m) period the defendant "knew or should have known that it would have been named as a defendant but for an error." *Id.* at 2493.

*Lindley v. City of Birmingham, Ala.*, 515 F. App'x 813, 815-16 (11th Cir. 2013).

Since the original complaint in this case was filed on January 22, 2010, plaintiff must show that by May 22, 2010, one-hundred and twenty days later, each defendant "knew or should have known that it would have been named a defendant but for an error." *Id.* at 816 (quoting *Krupski*, 560 U.S. at 2493) (internal quotations omitted). To this end, plaintiff presents two arguments: first, the present defendants "share an 'identity of interest' with the defendants named in the original complaint;" second, they "share common counsel." (Doc. 124 at 14.) In support of his first argument, plaintiff points out that the present defendants, like some of the original defendants, were employed at the Birmingham City Jail and that

14

Moten "received calls from the Shelby County Jail regarding Lindley's condition" on February 2, 2008. (*Id.* at 18-19.) In support of the second argument, he notes that he "filed his notice of claim against the City on May 21, 2008" and "[i]n less than two weeks[,] an assistant city attorney had received the notice of claim and began an investigation," pursuant to which the attorney "faxed a copy of the Notice of Claim to Principle Corrections Supervisor Russell Davis at the Birmingham City Jail, asking that Davis forward 'any and all information, complaints etc. . .  that your department may have regarding the matter.'" (Doc. 124 at 19-20.)

Notice based on "identity of interest" stems from a recognition that "the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 374 n.8 (5th Cir. 2010) (quoting *Kirk v. Cronvich*, 629 F.2d 404, 408 n.4 (5th Cir. 1980)[18] (in turn quoting 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure 1499 (1972))). Therefore, when a sheriff's office is sued, the sheriff himself shares an "identity of interest" with his office such that notice of the suit passes interchangeably between them. *See Kirk*, 629 F.2d at 408.

---

[18] *Kirk* was overruled on other grounds in *Schiavone v. Fortune, AKA Time, Inc.*, 477 U.S. 21, 106 S. Ct. 2379, 91 L.Ed.2d 18 (1986), *see Sanders-Burns*, 594 F.3d at 373 n.7, and is otherwise binding on this court pursuant to *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981).

But that is not necessarily so for all the sheriff's deputies. In *Garvin v. City of Philadelphia*, 354 F.3d 215 (3d Cir. 2003), where the plaintiff sued the city and "Police Officer John Doe," the Third Circuit stated that "absent other circumstances that permit the inference that notice was actually received, a non-management employee . . . does not share a sufficient nexus of interests with his or her employer so that notice given to the employer can be imputed to the employee for Rule 15(c)(3) purposes." *Id.* at 225 (quoting *Singletary v. Pennsylvania Dep't of Corrs.*, 266 F.3d 186, 200 (3d Cir. 2001)) (internal quotations omitted). In some tension with this point is *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998), where the Fifth Circuit: (1) found that "there was a sufficient identity of interest between the newly-named [police] officers" and the originally-named defendants, the city and one "Officer Osborne," to infer notice; and (2) "presum[ed]" that the initial city attorney "investigated the allegations, thus giving the newly-named officers . . . notice of the action." *Id.* at 320; *but see Garvin*, 354 F.3d at 227 ("[W]e [have] specifically distanced our court from [the aspect of *Jacobsen* that seemingly combines the analysis of identity of interest and shared attorney].").

The court is persuaded that the distinction between management and non-management employees is important in the identity of interest analysis in this case. The difference is one of responsibility for another: an employee "highly . . . placed in the [organization's] hierarchy," *Garvin*, 354 F.3d at 227, is responsible in many ways for the well-being of the organization. Thus, a court may presume that the higher-up is knowledgeable about business

affecting the entire organization. That is not so easily said of non-management employees, who, while certainly having some general stake in the well-being of the organization, are not necessarily looking out for any interest other than their own. So while the sheriff must share an identity of interest with the sheriff's office, a brand new deputy, one of fifty, say, does not share that same identity with the office of the sheriff, *or an identity with any other fellow deputy*.

On this point in this case, then, this court parts ways with the court in *Jacobsen*. Here, while Davis might share an identity of interest with "City of Birmingham Jail" originally sued, Sergeant Moten, one of thirteen sergeants Davis oversaw, (*see* Davis Depo. at 12), does not; nor do the other remaining defendants, the nurse, or the three correctional officers share an identity of interest with the (last-name-only) correctional officers originally sued.

But this court rejoins the court in *Jacobsen* in its analysis of constructive notice based on shared attorney. This case and *Jacobsen* are potentially distinguishable from *Garvin* in that in this case and *Jacobsen*, specifically identifiable "non-management" co-employees of the present defendants were named in the original complaint: in *Jacobsen* ("Officer Osborne") in this case ("Nurse Frida" and "Correctional Officer[s]" Glenn, Smith,[19] and Bird). (See Doc. 1.) In *Garvin*, the plaintiff simply named "Police Officer John Doe." It is

---

[19] Correctional officer John Glenn appears on the January 31, 2008 entry for the Jail's personnel report. (Doc. 125-4.) Correctional officer Smith appears in the cell block post ledger entry for January 31, 2008 as having been on duty on the J2 post for the 3 p.m. to 11 p.m. shift. (Doc. 125-5 at 2.)

easy to conclude that merely naming "Police Officer John Doe" in a complaint does not launch the city's attorneys into an investigation within 120 days sweeping so broadly that it may be presumed sufficient to put every city police officer on notice of a potential suit against him or her. *See Garvin*, 354 F.3d at 226-227.[20] In this case, however, it is hard to imagine that the city's attorney, who would later represent defendant Fredia Taylor once she was named in the Amended Complaint, (Doc. 50), would not have contacted Taylor soon after being presented with a complaint against "the City of Birmingham Jail" and "Nurse Frida." (See Doc. 1.)

For the other defendants, it is more appropriate to follow the rule that "a plaintiff must show . . . some communication or relationship between the shared attorney and the [unnamed] defendant prior to the expiration of the 120-day period." *Garvin v. City of Philadelphia*, 354 F.3d 215, 225 (3d Cir. 2003) (internal quotations omitted)). Plaintiff's second argument makes an initial misstep by conflating the filing of his "notice of claim" with the filing of his suit. The latter is the focus when a plaintiff is trying to impute notice

---

[20] In *Richmond v. McElyea*, 130 F.R.D. 377 (E.D. Tenn. 1990), a case on which plaintiff heavily relies, the magistrate judge found that "when [the originally named defendant] Knox County and its attorneys learned of this lawsuit, they 'should have taken steps to investigate the claim, including collecting and preserving evidence against any foreseeable eventuality.' Certainly, this investigation involved discussions with the officers on duty at the Intake Center on the night that plaintiff was arrested." *Id.* at 381 (quoting Kirk, 629 F.2d at 408). This court is unwilling to presume that the attorneys for Birmingham identified, or should have identified, within 120 days of the Complaint being filed, every correctional officer and sergeant who worked in plaintiff's area during his stay and discussed with them the possibility that the suit was directed at them rather than the named defendants.

of the filing of a lawsuit via shared counsel. But more importantly, plaintiff's argument ignores that the shared attorney relationship or communication must arise "prior to the expiration of the 120-day period" after the filing of the suit. *Id.* And there is no evidence in the record that this showing could be met here. The mere fact of shared representation later is not enough; some evidence of actual communication or relationship within the 120-day period is required. *See Smith v. City of Philadelphia*, 363 F. Supp. 2d 795, 800 (E.D. Pa. 2005) (finding that a shared attorney's pleading, which was filed within the 120-day period and which identified later-named defendants in response to a plaintiff's motion to compel, was evidence that those later-named defendants had a relationship with the shared attorney within the 120-day period, imputing notice; but finding that notice could not be imputed to the later-named defendant not identified in that pleading).

Because plaintiff has not shown that defendants Thomas, Harper, Tarver, and Moten "received such notice within the time period of Rule 4(m), 120 days" of the filing of the original complaint, and "knew or should have known [within the Rule 4(m) time period] that the action would have been brought against [them], but for a mistake concerning the proper party's identity," Fed. R. Civ. P. 15(c)(1)(B), (C)(i-ii), the claims asserted against them in the Amended Complaint do not relate back to the date of the original Complaint and are thus time-barred. Only plaintiff's claims against Taylor remain.[21] Those claims are for deliberate

---

[21] Since only claims against one defendant in her official capacity remain, defendants' arguments in section III.a. regarding duplicity have been rendered moot. (See Doc. 121 at 19-20.)

indifference to serious medical need in violation of the Eighth Amendment, violation of the Equal Protection clause of the Fourteenth Amendment, negligence, and spoliation.

## II. Federal Claims and Qualified Immunity

Lindley claims that Taylor displayed negligence and deliberate indifference toward the infection on his leg, an infection so serious that once he was released into the care of another county, a nurse immediately recognized the problem and had him transported to the hospital, where he was treated for fourteen days. "Deliberate indifference to a [detainee's] serious medical needs is a violation of the Eighth Amendment." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007); *see also id.* (explaining applicability of the Fourteenth Amendment in situations like this one). Lindley's burden is to prove he had a serious medical need, that Taylor acted with deliberate indifference toward it, and that such indifference caused his injury. *Id.*

Taylor's assertions that "[p]laintiff must [and did not] prove that he had MSRA or a staph infection while incarcerated at the Birmingham City Jail" is not merely misguided, but disappointing. First, it does not matter the name of the bacteria infecting Lindley's leg or even that it was bacterial; Lindley could have mistakenly called his infection the plague. It is sufficient that by the time he was released from the Birmingham City Jail, the infection had so obviously manifested on his skin that it required immediate hospitalization, an immediate procedure to drain the pus from his leg, and two rounds of surgery shortly thereafter. But

second, there is strong evidence that Lindley's self-diagnosis of a staph infection was in fact correct. Therefore, defendant cannot seriously argue that Lindley did not suffer from a serious medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)).

To establish deliberate indifference, Lindley "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Goebert*, 510 F.3d at 1327 (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)) (alteration brackets omitted). Whether Taylor subjectively knew

> of the risk of serious harm is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a [nurse] knew of a substantial risk from the very fact that the risk was obvious. Disregard of the risk is also a question of fact that can be shown by standard methods.

Goebert, 510 F.3d at 1327 (internal citations and quotations omitted). In the context of delay in providing medical care, guiding the analysis of whether a defendant's conduct amounted to something "more than gross negligence" are these factors: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Id.

Lindley relies on his allegations in his affidavits of May 21, 2008, (*see* Doc. 125-9 at 1-2), and October 25, 2010, (Doc. 125-2 at 3-4), which are substantially the same. Because

the specific allegations are important in attempting to pin liability on Taylor, the court quotes

directly and at length from the affidavits:

> On Sunday, January 27, 2008[,] I discovered a sore on my right knee. Within 12 hours the sore had gotten much worse. It had become swollen and sore. My skin around the sore had begun to turn red. . . . Starting January 28, 2008, I began to request that someone look at my right knee and the sore. I specifically recall reporting my medical need to Nurses Fredia Taylor and Allinda Brown. . . . I began filling out [medical request] forms on Monday, January 28, 2008[,] and continued to fill out the forms at each nurse call [four times per day] until [February 2, 2008]. With each day, the condition of my knee became worse. . . . During the week of January 28, 2008[,] I continued to fill out requests to see the doctor. I showed my knee to both nurse Taylor and nurse Brown. They told me that it was not serious and would only give me a Tylenol pain reliever. . . . Later in the week, I became feverish . . . . At the time I showed the nurses my leg, my entire knee area was clearly swollen, red and very warm to the touch.
> 
> . . .
> 
> [T]he infection became steadily worse, it became more and more painful, my leg became more and more swollen, my knee and leg had a pronounced red tone, and was plainly and clearly inflamed. On several occasions I raised my pants leg and showed my knee and leg to both the nurses and several correctional officers. Later in the week and over the next weekend [(presumably beginning Friday, February 1, 2008)], it became too painful to raise my pants leg over my knee and at that time I would lower my pants in order to show the nurse or correctional officers my knee and leg. I specifically remember talking to and showing the condition of my knee to nurse Fredia Taylor . . . .[22]

(Doc. 125-2 at 3-4.)

---

[22] Taylor testified that she didn't remember seeing him as an inmate, but shortly thereafter testified that she only recalled him being in the jail after being shown a picture of him. (Doc. 125-18 (Taylor Depo. at 9-10).) When told that Lindley likely stayed in J-2-D (which is incorrect; he stayed in J-2-A, (*see, e.g.*, Doc. 125-3 at 12)), Taylor testified that she "wouldn't go up there." (*Id.* at 14.)

At times, these allegations devolve into generalized accusations against the entire nursing staff. But, taken as true and construed in the light most favorable to Lindley as the non-movant, and combined with the fact that plaintiff required immediate hospitalization after being released from the Birmingham City Jail, these allegations are enough to support a justifiable inference that at some point, Taylor saw Lindley's leg in a condition bad enough to where refusing treatment (other than Tylenol) represented deliberate indifference to a serious medical need.[23] *See Newsome v. Chatham Cnty. Detention Ctr.*, 256 F. App'x 342, 345-346 (11th Cir. 2007) (affidavit like the ones here, though "self-serving," was "sufficient evidence to create a genuine issue of material fact that the nurses were deliberately indifferent," and the evidence must be construed in the light most favorable to the non-movant); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014). It is important that he "specifically recall[ed]" and "specifically remember[ed]" reporting to and showing his condition to Taylor,[24] (*see* Doc. 125-2 at 3-4), because the court can justifiably infer from this that he showed his leg to her at a time when it obviously required prompt medical attention. The court emphasizes the importance of the fact that officials from Shelby County immediately recognized Lindley's dire condition and took him to the hospital, at which time doctors made

---

[23] The court recognizes that this affidavit is subject to different interpretations, and, if not read in the light most favorable to Lindley, could support a finding that Taylor only looked at the sore on Lindley's leg *at some point*, but not necessarily after it had become "clearly swollen," or "clearly inflamed."

[24] That other nurses may have also ignored Lindley's complaints does not affect Taylor's culpability.

an incision to drain pus from his leg, put him on an IV drip, and sent him into surgery three days later for debridement from which Lindley would take ten months to recover. Taylor puts forward no reason for refusing to treat Lindley or for not having him examined by a physician.

As for causation, it is enough that Taylor's deliberate indifference may have caused Lindley to languish in pain for a number of days after requesting attention. *See Newsome v. Prison Health Servs., Inc*., CV405-042, 2009 WL 1469203 (S.D. Ga. May 26, 2009) (citing *Farrow v. West*, 320 F.3d 1235, 1242-1243 (11th Cir. 2003)). But the court can justifiably infer from the February 5, 2008 Operative Report from Dr. Sherer, which states, "[t]he patient had extensive infection of the right lower extremity, which was not responding to antibiotics," and, "[l]arge amounts of necrotic fascia were debrided," that Taylor's deliberate indifference also may have caused Lindley's infection to progress beyond the point that it would respond to antibiotics, the failure of which led to plaintiff's surgery, and may have caused there to be more "necrotic fascia," and thus more debridement (and loss of more tissue and skin), than there otherwise would have been had Lindley received earlier medical attention. (*See* Doc. 125-8 at 11.) These are questions for the jury.

Taylor argues that she is entitled to qualified immunity for the federal claims against her in her individual capacity. "To claim qualified immunity, a defendant official must first show that [her] allegedly wrongful act or omission occurred while [she] was engaged in a discretionary duty." *Goebert*, 510 F.3d at 1329. The parties do not dispute and the court

agrees that Taylor was at all relevant times acting within the scope of her discretionary authority as a nurse at the jail. (*See* Doc. 121 at 22; Doc. 124 at 29-30.) "If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir.2004)). The analyses of deliberate indifference and violation of clearly established law seem interdependent, in that if a defendant is deliberately indifferent to a serious medical need, then it seems clear that her actions are unlawful. At one time, the Eleventh Circuit seemingly mandated this result: "A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994) (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992)). But the Eleventh Circuit has subsequently backed away from that statement. *See, e.g., Goebert v. Lee Cnty.*, 510 F.3d 1312, 1329 (11th Cir. 2007) (finding that the jail's facility commander engaged in "deliberate indifference to the true facts of an inmate's medical condition and needs," and conducting a separate analysis to determine whether the facility commander was, nonetheless, entitled to qualified immunity).

"A judicial precedent with materially identical[25] facts is not essential for the law to be clearly established, but the preexisting law must make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010); *see also Hope v. Pelzer*, 536 U.S. 730, 742-43 (2002) ("The Court of Appeals' conclusion to the contrary exposes the danger of a rigid, overreliance on factual similarity. . . . [From prior precedent, the] unlawfulness of the alleged conduct should have been apparent to the respondents."). Since Taylor did nothing for the five or so days that Lindley's sore was infected, other than give Lindley Tylenol, she is not relying on the notion that prior precedent did not make it "apparent" that the medical attention she was providing was constitutionally inadequate. Therefore, if she is entitled to qualified immunity, it must be because prior precedent did not clearly establish that plaintiff's infected leg sore, which had been worsening over the course of five days, was a "serious medical need."

To begin with, Taylor's deliberate indifference when presented with Lindley's infected sore is probably the sort of "egregious [] violation" that merely requires a "general [] statement of law" from prior precedent. *See Goebert*, 510 F.3d at 1330. So the fact that "an official acts with deliberate indifference when [she] intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition

---

[25] Indeed, even a "materially similar" case is not required. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

or an urgent medical condition that would be exacerbated by delay," *id.* (quoting *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 (11th Cir. 1997)), is probably "fair warning" enough in this case, *see Hope*, 536 U.S. at 741. But more specific prior precedent also gave Taylor the requisite fair warning that Lindley's infected leg sore constituted a "serious medical need." In finding that sores resulting from scabies were a serious medical need, the court in *Ciccone v. Sapp*, 238 F. App'x 487, 489 (11th Cir. 2007), a non-binding opinion, cited the binding opinion in *Andujar v. Rodriguez*, 486 F.3d 1199, 1203-04 (11th Cir. 2007), which it characterized as "holding that a dog bite that caused more than superficial wounds, impaired walking, and left the plaintiff crying in pain could be deemed objectively serious." This court, likewise, finds that the holding in *Andujar* that a dog bite was a serious medical need provided Taylor the requisite fair warning that the infected sore described in this case was also a serious medical need.[26] A reasonable nurse would have known that refusing treatment under these circumstances was unlawful. Therefore, Taylor is not entitled to qualified immunity. Her motion for summary judgment on Count I is due to be denied.

---

[26] By way of negative comparison, the court offers *Youmans v. Gagnon*, 626 F.3d 557 (11th Cir. 2010), where the Eleventh Circuit noted that "significant, sustained bleeding requiring later stitches is a far greater indicator of a need for urgent medical care than the mere presence of cuts and bruises as in the present case." *Id.* at 565-66. In the present case, significant, sustained infection requiring later surgery is a great indicator of a need for urgent medical care.

**III. State Law Claims**

**a. Negligence**

Taylor claims that she is entitled to summary judgment on the state law claims for negligence and spoliation of evidence against her because she has immunity as a peace officer pursuant to Ala. Code § 6-5-338. Subsection (a) of the statute provides in relevant part:

> Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, . . . and whose duties prescribed by law . . . include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons . . . , shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a).

A plain reading of the statute makes clear that Taylor, as a nurse in the City Jail, is not a "peace officer . . . empowered by the laws of this state to execute warrants, to arrest and to take into custody persons," and therefore, she is not entitled to immunity under the statute. And as Lindley points out in his brief, (Doc. 124 at 33), the Alabama Supreme Court's decision in *Walker v. City of Huntsville*, 62 So. 3d 474 (Ala. 2010), mandates this result: no evidence in this case "shows that the jail nurse was employed or appointed as a peace officer or that he or she exercised the duties of a peace officer identified in § 6–5–338(a), such as

the enforcement of or the investigation of criminal laws. The jail nurse, therefore, was not

. . . an officer of the State under 6–5–338." *Id.* at 501 (internal citations omitted).

Taylor also argues that she is entitled to state-agent immunity under *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000). But while Cranman's "restatement of State-agent immunity" is broader than the immunity extended by 6-5-338(a), *see Walker*, 62 So. 3d at 497, it still does not cover Taylor's actions. In refusing to give Lindley medical care, Taylor was not performing any of the actions covered by *Cranman* immunity. She was not:

> (1) formulating plans, policies, or designs; or
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
> > (a) making administrative adjudications;
> > (b) allocating resources;
> > (c) negotiating contracts;
> > (d) hiring, firing, transferring, assigning, or supervising personnel; or
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons;[27] or
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

---

[27] In *Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006), the court added the following language to the end of this section: "or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975." *Id.* at 309 (emphasis removed).

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

Taylor states that her conduct "certainly falls within category four," (Doc. 121 at 28), but she was not "enforc[ing] the criminal laws of the State" in examining and refusing to treat Lindley, *Ex parte Cranman*, 792 So. 2d at 405, nor was she "serving as a peace officer[]," *see Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006). She also states that her actions "fall directly within category 3," (Doc. 121 at 28), but she does not identify any "statute, rule, or regulation" that required her not to treat Lindley. That her actions do not somehow squeeze into those—or any—category is made abundantly clear on the very next page of *Ex parte Cranman*, where the court holds that "[t]he conduct of the [state-employed] physicians, in their treatment of [plaintiff], does not fit within any category of conduct recognized by the restated rule as immune. The physicians are therefore not entitled to State-agent immunity." 792 So. 2d at 406.

Because Taylor did not have state-law immunity in refusing to treat Lindley, her motion for summary judgment as to Count III is due to be denied.

**b. Spoliation**

Taylor argues that she did not "voluntarily undert[ake] to preserve . . . evidence, or agree[] to preserve . . . evidence," and that no "specific request was made to [her] to preserve . . . evidence." (Doc. 121 at 30.) The court agrees, and Lindley abandoned this claim against Taylor by failing to argue it in his brief. Therefore, Taylor is entitled to summary judgment as to Count 4, and plaintiff's claim against her for spoliation is due to be dismissed.

## <u>CONCLUSION</u>

Based on the above analysis, the court finds that defendants' Motion for Summary Judgment, (Doc. 120), is due to be granted in part and denied in part. All defendants except Taylor are due to be dismissed from this action because the Amended Complaint does not relate back against them and is thus time-barred. The Amended Complaint does, however, relate back against Taylor. Lindley's claims for an Equal Protection Violation and Spoliation against her are due to be dismissed. His claims for deliberate indifference to serious medical need and state law negligence against her remain. An order in accordance will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 23rd day of March, 2015.


SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE

31